Good morning. Be seated. We're here for the embanked argument in National Resource Defense Council v. Salazar. And Judge Gould is joining us by video from Seattle. Good morning, Judge Gould. You're able to hear everything? Good evening. We can see you very well. Council ready? We see the full house today. We were having dinner last night with our law clerks, and Justice Kennedy joined us, our circuit justice, and he happened to mention that when he was going to law school, there was no such field as environmental law. I guess things have changed. We'll hear from petitioner. Council ready? Or from appellant. Good morning. May it please the Court. My name is Barbara Chisholm, and I am here today on behalf of Plaintiffs and Appellants Environmental Organization. I would like to reserve eight minutes for rebuttal. You can hope. Thank you, Your Honor. The district court ruled against plaintiffs on two threshold issues, plaintiffs standing to challenge the adequacy of the ESA consultation on the renewal of the Delta-Mendota Canal contract, and second, whether the Bureau's actions in negotiating the terms of the renewed Sacramento settlement contract involved an exercise of discretion sufficient to trigger a complication requirement under the Endangered Species Act. Both the standing and discretion arguments boil down to a question of whether the Bureau, had it consulted with the Fish and Wildlife Service on the renewal of these long-term contracts on the basis of a valid biological opinion, could have negotiated terms that were more protective of the smelt and its habitat than those which it did negotiate. The answer is unequivocally yes. So which biological opinion are we talking about? As I understand it, we have two or three that were in play, but the most recent one has been invalidated in part by the district court. What's the status of that? That's correct, Your Honor. The concurrence here, the consultation on the contracts themselves, were based on a 2004 and 2005 biological opinion. The 2005 biological opinion was invalidated. So why doesn't that render moot, then, the whole issue with regard to the renewal of these contracts under that biological opinion? Well, Your Honor, there has not been a valid consultation based on a valid biological opinion. There is, as you mentioned, a new biological opinion, a 2008 biological opinion. But that opinion did not consider the terms of the contract. It took the contracts as a given. And, as Your Honor pointed out, it has been in part invalidated. That appeal is pending in the circuit right now. But isn't it so that your clients did not oppose the 2008 opinion? That is correct, Your Honor. And isn't it also true, then, that whether that 2008 opinion is valid or not is on appeal before a panel that heard argument on September 10? In fact, Judge Rawlinson was on the panel. Isn't that also true? That's correct, Your Honor. So, then, I guess the district court and the panel here really were under the idea that this could not eventually moot out the matter. But they only said that because by the time it was heard on appeal, the court had concluded that parts of it were unlawful. Should we, then, hold because the panel had heard this 2008 biop, could say it's valid and it could eventually moot out this matter? No, Your Honor, for several reasons. First, it is still on appeal. But, more importantly, the question on mootness is whether plaintiffs have any remedy that they could seek. And the burden is on the defendant to show that there's no remedy that could remedy the harms that plaintiffs complain of. Here, the 2008 biological opinion, in fact, has not been fully implemented. The Bureau is still considering whether to implement parts of the reasonable and prudent alternative. And, second, the Fish and Wildlife Service, in 2010, in considering a listing of the smelt, said that even under the 2008 biological opinion, there are still harms to the smelt. Well, I guess the parties are engaged in settlement discussions regarding the long-term programmatic future of the CBP. Is that correct? I'm not aware of that, Your Honor. You're not? Okay. I'm just wondering, I thought things were continuing to go on while we're here. Your Honor, there is a 2008 biological opinion that the Bureau, in part, is implementing. They are considering whether to implement two components of that biological opinion. So, how is our decision on this appeal relevant to what's ongoing? I don't think it necessarily is relevant, Your Honor. What plaintiffs ask for is that there be a consultation under the ESA on the renewal of the long-term contract that's based on a valid biological opinion. Okay. Could I stop you there? Because we're in circles on the valid biological opinion. The 2005 biop has been superseded by its terms by the 2008. Is that correct? It has, Your Honor. Okay. And the 2008 is actually still in effect. It's not been vacated. Is that correct? It's just been – it went back to the district court and now up to the circuit? It is in effect. It has been provisionally accepted by the Bureau. Okay. So, now we have a superseded biop, which is 2005. We have an extant biop, which is 2008, which may or may not be upheld depending on the outcome of that case. And are you saying it doesn't really matter whether it's upheld? Because when you keep saying subject to a valid biological opinion, we have two biops. Are you suggesting there's yet to be a third one? There could be, Your Honor. I guess I should be more clear. The consultation here that needs to happen is consultation on the terms of the contract. We need consultation on the amounts, on the timing, on the price of the terms. The 2008 biological opinion, even if it were in full effect, which it's not, did not consider the terms of the contract. It took the contract as a given. So there's never been a consultation on the terms of the contract. May I just – I'm just trying to untangle these. If that's the case, but the 2005 has been superseded, what's then the procedural foundation for this appeal? Because would it then be that the 2008 biop is somehow incomplete? I mean, I know it was favorable to you in large part, so you wouldn't appeal from it per se. But you're suggesting it didn't have the complete coverage. And just to be honest, the way that the Bureau and the Fish and Wildlife Service initially envisioned this was that they would consult on what's called the OCAP, the Operating Criteria and Plan for the overall CDP, the Central Valley Project. And then they would consult individually on the contract under the ESA. And they did that. They did consult on the contract. But what they did when they consulted on the contract and issued concurrence letters was say, you know, see the OCAP biop. That was fine. So they relied on the OCAP biop, but it was not the controlling consultation. When you say the OCAP biop, you know, there's so many acronyms flying around. Does that have a year? Excuse me, Your Honor. The 2005 and the 2004. So some of the concurrence letters that were issued when the Bureau consulted on the contract, some were based on the 2004, some were based on the 2005. Both of which are now superseded. Both of which are now superseded, but those were separate consultations on the contract, on the terms of the contract. So are you asking us to just order the Bureau to reopen all of the contracts that have previously been renewed and renegotiate each and every one of them? Is that the relief you're seeking? We are asking, Your Honor, for reconsultation on the contract. You're not answering my question. It's a very simple yes or no question. Do you want us to order the Bureau to, in essence, invalidate all of these existing contracts and reopen negotiations? No, Your Honor. Then what are you asking us to do? We are asking that you order the Bureau to reconsult and to direct the District Court to consider whether injunctive relief is proper. We believe that injunctive relief should be one of the possibilities that the District Court had before it. But wouldn't that injunction reach these underlying contracts? Yes, it would, Your Honor. So you do want the contracts reopened. We want that to be one of the possibilities that the District Court considers on rematch. So you want consultation with the Fish and Wildlife Service, and whatever comes from that consultation will drive the remaining action. That's correct, Your Honor. Can you tell us how that works unhinged from a buyout? I'm just trying to understand procedurally. How do I follow what you want through the statute? Right, Your Honor. So the Fish and Wildlife Service would consult on the terms of the contract and say, are the amounts that are being promised under these contracts, and is the timing of the water that's to be delivered under these contracts adequate, and would they harm the smelt if we continue to provide that amount of water? So are you talking both base and project water? I am, Your Honor. All right, but they're not the same. So what effect does the 2008 buyout have on the contracts that are already in existence? The 2008 biological opinion took the contracts that are in existence as a given. So it has no effect on those contracts. That's correct. The problem that I'm having, Counselor, is that it seems to me that everybody went to the District Court, and you were suggesting that to rely on this buyout 2005-2004, that it was an abuse of discretion and that something ought to happen as a result thereof. The government, on the other hand, was saying they don't even have any standing to get here. And not only that, even if they don't have any standing to get here on one part of the contracts, the other part of the contracts, there's just no way that they need to be undone. The District Court didn't really suggest, it seems to me, whether there was they said there was some kind of an abuse of discretion, if you will, to rely on the 2005 buyout, but it didn't say so what about the contracts. I mean, the problem is is that the contracts have been entered into on a buyout that was valid at the time they were entered into it, thereafter declared invalid, which you therefore think there ought to be some kind of reconsultation. But I don't know whether the District Court even thinks that the reconsultation would result in any difference in the contracts. So again, and then I have a 2008 buyout that could be valid and could suggest that we don't have even any 2005 to deal with. So I'm still trying to figure out, again, in that situation where the District Court has said generally failure or the reliance on a 2005 buyout is an abuse of discretion but doesn't say what that does with contracts, and where they also say the 2008 might have mooted it, but based on what it is, it didn't moot it, why I shouldn't remand this back to the District Court and say sort this out. And when you do, come back and we'll tell you whether you did it right. Your Honor, I think that is appropriate. What we are asking for is a reversal on the two threshold issues that kept plaintiffs from really reaching the merits here, the standing issue and the discretion issue. Your Honor, it's correct that the District Court did not rule on the merits, but the merits here would be whether the Bureau's reliance on what was an invalid biological opinion when it did its consultation on the contract, whether that was arbitrary and capricious. Counsel, I want to follow up before you go along with that thought. Judge Tallman asked this question as well. Just as a matter of basic law, I understand your position to be that you got standing, there was discretion involved here, there was no consultation, but as a matter of law, doesn't that mean that the contract is void ab initio? Your Honor, the District Court... I want a clear answer from you. Isn't that true, that the contract is void ab initio because the underlying condition precedent to executing that contract was a consultation with Fish and Wildlife if required by the Endangered Species Act. Isn't that correct? I think the way to look at it is whether the contract, the agency action here, needs to be set aside because it was in violation of law. Okay, but that's just another way of saying the contract is void. That is correct, but the agency action needs to be set aside. At the end of the day, that's what we get to. So let's assume for a moment that you're correct. What happens? This has been going forward on these two different biological opinions. Judge Smith has made some points about how the District Court didn't deal with all of those, but the reality is if you're right, then the contract is void. What happens? Well, Your Honor, I think NRDC v. Houston is instructive here. In that case, the court decided that, in fact, the contract should be set aside because it would be prejudging the terms and conditions of the contract if you were to leave it in place and just consult on that contract. Particularly since you take the position, perhaps correctly, that the agency has discretion, the terms of the contract can be changed in any number of ways. So basically the whole thing needs to be renegotiated. But, Your Honor, yes, but Houston also says that one of the options that a District Court would have would be simply to keep the contract in place during consultation. So I think the question of the remedy is really a question for the District Court. In the past, the Bureau and the Fish and Wildlife Service have entered into interim contracts pending consultation, so I think there's a wide variety of remedies that the court could put in place to ensure that water continues to flow. Sure, but the District Court has inherent power to kind of keep things together in the meantime. But the bottom line is you want the contract voided. You need to start from scratch from your perspective. That's correct, Your Honor. I have a real question, though, about I see base and project water differently from this standpoint, or I want you to respond to this. You seem to want that. When this started, that there was, you know, the backdrop of this is that California said there's senior and junior water, you know, people with interest, and that those are not something that are discretionary, that that was part of the whole thing. And it seems to me that you want to go back and you want to discuss base supply as well. And it seems to me that an argument could be made that there may be discretion on project water, but not on base water when you look at how these contracts came about. Yes, Your Honor. So I think you are correct to distinguish between base supply and the project water. In fact, the federal defendants here have acknowledged that they do have discretion to negotiate the terms of project water. They change the amounts of project water delivered. They change the pricing. They change the timing of project water delivery. So there's clearly discretion with respect to the project water, and that alone should be sufficient to have discretion here. In National Wildlife Federation. Well, okay, but let's say they are different, and let's say, but it seems to me that you want to consult on base supply, though, too. I mean, is there an argument that that may not be an area that they have to consult? You know, I guess it may still mean that consultation has to occur, but is there, you know, is there something, there seems to be an argument somewhere that base supply is sacrosanct and goes back to original title holders and that you, you know, that you're looking for the chink in the armor to get into base supply, too. Well, Your Honor, you are correct that the settlement contractors certainly make that argument. The, as you're asking. Well, what's wrong with the argument? So what's wrong, well, first I just want to say that if the, even if they are correct, there still needs to be consultation. The, what's wrong with the argument is that the title. But the consultation would not allow you to reach their base supply. Well, Your Honor, I don't think that a, if the district court were to find, rule in the merits and order reconsultation, I don't think the district court would need to say on what they were reconsulting. If this court wants to reach the question of whether there is or is not discretion with respect to base supply, we would certainly urge the court to find that there is discretion. And the reason is that the settlement contracts themselves are just that. They are settlement contracts. They were entered into. Now you're asking us to undo the settlement from 1964? Is that, I mean, how far are you going to take us? Should we take Shasta Dam down? Your Honor, no. The settlement contracts were entered into to resolve a dispute over water rights. They entered into it. They settled the amounts that the Bureau would allow to be diverted for 40 years, subject to renegotiation on neutrally agreeable terms. So they're not really senior water rights? They're sort of a life estate for 40 years and then they revert to who? They are certainly senior water rights. We're not disputing that. But the question of the scope of those senior water rights has never been decided. That's crystal clear from the preamble to both the original settlement contracts and the new settlement contracts. In fact, if you look at the new settlement contracts, you'll see that there was litigation over the Bureau's discretion to change the amounts, and they settled that litigation and they entered into new contracts. So it's certainly, it continues to be an issue of dispute, and they entered into settlement contracts precisely to resolve the dispute. Would you clarify the, your argument is that there wasn't proper consultation, correct? That's correct. Is that really a different form of simply saying that you didn't agree with the buy-up in 2005? In other words, there was consultation, correct? There was consultation. So there was consultation, but you just didn't like the outcome of the consultation. No, that's not quite correct. We certainly did not like the outcome of the consultation, but the issue is whether the Bureau consulted with the Fish and Wildlife Service in a meaningful, non-arbitrary way. And that's the merits that Judge Smith was talking about that really have not been reached by the district court. So under, for example, resources limited, the Bureau could be found to have not engaged in proper consultation where it knew or should have known that the information on which it was relying here, the abundance of the smelt and the dire straits that they were in, was arbitrary. I'm still having some trouble fitting them together then, because if the first issue being standing, let's assume, just for talking purposes, that you have standing to challenge the nature of the consultation. Then, of course, the merits have never yet been decided as to whether it was arbitrary and capricious, et cetera. But if we were to decide in your favor on the standing issue, then would it just go back to the district court and all the questions we're asking would be, in effect, in front of the district court? Yes, I think the question before the district court, which is one actually that the district court reached, albeit in dicta, is whether under resources limited this was arbitrary and capricious for the Bureau to rely on the no jeopardy finding, that the continued operations of the project would have no jeopardy. The district court reached that issue, but said he didn't need to reach it, and said yes, in fact, that it was arbitrary. But that, I think, would be something that the district court would need to rule on and then reach the question of whether a remedy was available. And the remedy, though, in your view, what is the basis then for a substantive decision if you have the buy-off that was supposedly deficient, superseded by the 2008 buy-off? What then is the statutory foundation for the reconsultation? Well, the statutory foundation continues to be Section 7A2, which requires consultation on all agency actions. But I think what Your Honor is asking is really what happens then, and I think the Bureau and the Fish and Wildlife Service would have options available to them. They could either consult on the terms of the particular contract and view biological opinions on those contracts, or they could reach some agreement to wait until the 2008 biological opinion is either in place or invalidated, and then again decide to tier from that biological opinion. But I think the question is really whether there has been consultation regarding the terms of the contract based on the best available science. Well, that brings us to the discretion issue. Yes. Where does the Bureau have discretion to choose among those options that you listed? Well, the Bureau has – the discretion issue is really whether the Bureau has discretion to negotiate terms of a contract that could inurt the benefit of the smelt. That's clearly the standard under both homebuilders and this Court's decision. And the Bureau has discretion in several ways. With respect to the project water, as we were talking about, it has broad discretion, certainly, and that's been acknowledged by the defendants, federal defendants. But what if the district court said that the Bureau didn't have discretion on anything, right? That's correct, Your Honor. We disagree with that. Right. But what do we have to say here in terms of – because the district court held that, I think, Article 9A of the SRS contracts required the renewal with the same base supply, right? The district court said that. And then what did the district court say about the project water? The district court read that as a whole regarding all of it. But here the facts are clear that the – excuse me – the Bureau, in fact, did negotiate different terms. They, in fact, negotiated different terms for base supply, but in particular they negotiated different terms for delivery or diversions of project water, the pricing of project water, and the amounts of project water. So there can be no real dispute that the Bureau did not have discretion to do so. In fact, I would point, Your Honor, but the problem comes, I guess, and I guess I'm getting back to where I was. There was a consultation here. There was an absolute consultation. But the only reason we're reaching consultation is that you're now suggesting that because there was a consultation and the contract was based on this consultation, which was thereafter declared to be unlawful, that it's an abuse of discretion to have relied thereon, which the district court in dicta said it was, and then didn't say what it meant. And the government said we didn't need to consult in the first place. And not only did we not need to consult in the first place, but these people don't have standing to be here. And therefore we are re-going through issues which have in general been already taken care of, haven't we? And that's why I'm a little worried that even if we grant, even if we saw it all your way, it still seems to me the district court is faced with the whole of what we have to deal with to get to merits, which you also asked for on appeal, but I just can't find out how we get there. Right, Your Honor. I think if this court wanted to, it could reach the merits because I think they are very straightforward, but I think the better course would be to remind the merits. What happened here was, in fact, that Plaintiff's claims were kicked out on two threshold issues, both of which are clearly erroneous. The standing issue, Plaintiff's clearly has standing. We've alleged an injury to the smelt that's directly caused by the delivery of water pursuant to these claims. You have five minutes. Thank you, Your Honor. And we have, and there's discretion. There's clear discretion for the Bureau to act. So on that point, assume we agree that Article 9 deprives the Bureau of renegotiating water quantities. Is there enough discretion remaining as to other aspects of the contract that could lead to contracts that inure more to the benefit of the smelt, and what is that? Absolutely, Your Honor. And we've put in evidence showing that the pricing does affect the conservation measures and would affect the smelt, that the timing is particularly important to the smelt when the water comes into the delta is, again, critically important. But also we would urge that Article 9 be read in consultation with the other provisions of the contract, which makes clear that it's, in effect, only for the term of the contract, the 40 years, and then it needs to be renegotiated. I would like to reserve the remainder of my time for everybody. Thank you. We'll hear from the other side. May I please support? My name is Robert Oakley. I'm here on behalf of the federal defendants. I'm splitting, or we're splitting the appellees, the time, 10 minutes equally. I'll pay attention to the clock and try to get done within 10 minutes. I'd like to start by clarifying what remains in place of the 2008 biological opinion. Crucially, the reasonable and prudent alternative that the Fish and Wildlife suggested to reclamation, to avoid jeopardy, remains in place. This imposes pumping limitations in the winter and spring under certain conditions. By pumping limitations, I mean how hard the pumps can be run, which send or export the water south of the delta to users in that area of the state. And then, in certain years, under unusually wet conditions, there can be requirements of releases in the fall to affect the location of the smelt and move them towards a more favorable habitat. All of this was discussed at great length on September 10, 2012, when, at that time, I had NRDC on my side. We were both defending the biological opinion. But the crucial point here is that measures to protect the smelt from jeopardy are in place. NRDC agrees that if these measures are implemented, the smelt will be protected from jeopardy. What is the point of disagreement between you and NRDC regarding the consultation issue? Well, the point is that the 2005 BIOP has been superseded. And their concern and what they're entitled to raise is whether the Central Valley Project is being operated in such a way that it's going to put the smelt at jeopardy. And we have addressed that issue. But I don't want to imply agreement. But I'm talking about in terms of consultation. NRDC says that there has not been adequate consultation. You say that there has been adequate consultation. So what is the point of disagreement regarding that? Why do you say it's adequate and NRDC says it's inadequate? I say it's adequate because it protects the smelt. NRDC says it's inadequate because they want a separate consultation on the contracts. The contracts were considered in the 2008 BIOP. But Fish and Wildlife did not go set of contracts by set of contracts and say, do this to this set of contracts, then do that to that set of contracts. Well, where specifically in the 2008 BIOP, does FWS analyze the effects of renewing the SRS and DMC contracts? It takes that renewal as a given. Okay. So it doesn't specifically say that. That is correct. They are discussed in the baseline. Counsel, isn't that the problem because those renewals were based on the invalidated 2005 and 2006 BIOPs? The original renewals were based on the 2004 and 2005 BIOPs. That is correct, which is held invalid and that issue has never been appealed. Okay. What I don't understand is how come the FWS only changed its position as to the threat to the smelt between the 2004, 2005, and 2008 BIOPs? I'm sorry. Why did they change it? They essentially did a 180. Because just at the time the 2005 BIOP came out, information came in that there had been a disastrous population decline, both for the smelt and for other similar species. And so it was just as soon as the ink was dry on it. And by the way, no one's ever figured out why this happened. It was clear that the 2005 BIOP, which unlike the 2008 BIOP, was a no jeopardy BIOP, that there had to be reconsultation under the regulations. Something so significant had happened that the agency had to look at it. Both agencies had to look at the issue. Why shouldn't the agency have to look at each individual contract to see if it satisfies the overarching goals of the 2008 BIOP, which now says there is a threat? Because the 2008 BIOP did not try to do this on a contract-by-contract basis. And I think wisely because that would be a very slow process. You'd have to wait for all the contracts to come up for renewal. Fish and Wildlife looked at this in a different perspective. What does Reclamation have to do to protect the smelt? And it came up with the pumping restrictions and then the releases in certain wet years to move the smelt for their habitat. So could you explain then, let's forget about going through contract-by-contract, a fundamental assumption, as I understand it, of the 2005 BIOP opinion, was a level of fish in or near jeopardy. Then this accident happens, and so it changes. So why logically wouldn't FWS take another look at the universe of circumstances in light of that and say, okay, now we've got a much more threatened species. Why wouldn't the collective of the diversions by contract be a relevant consideration in developing? You say, well, they came up with some other alternatives. Where do we have any confidence that they looked at the impact of these contracts in making their 2008 evaluation? They did exactly what Your Honor is asking. They took the seriousness of the situation and reconsidered it. The point is that they looked at what the water that the smelt needed. Now let me be clear. These measures that I'm talking about will likely impact the water contracts that are before the court, particularly the contracts with DMC, because if we impose pumping limitations, then less water is going to go south of the delta. The DMC contract, however, we can short those contracts if there's a valid, as long as the RPA is in place. And so there will be an impact on them. To say that there's no impact on the contracts is simply wrong. But isn't that kind of backwards? Weren't we supposed to look at the cumulative effects of the contracts before making the decision as to what measures to implement? We could have done it that way, but as Judge Wenger said, NRDC did not object to the procedural approach of tiering that went to the O5 Biop. The Biop was simply invalid. Judge Wenger, I think, promptly pointed out the best way to look at this is in terms of the overall operations of the Central Valley Project as opposed to whichever contracts are up for renewal, because there's only so much water in any one set of contracts. Right. But you know what I'm having some trouble with is that you have now an invalid Biop, which was the original basis. When you go to the 2008, you begin your argument by saying, we just accepted the contracts having been entered into, although there's now some tinkering that could be done under different aspects. But whether or not to do the renewal, isn't that a threshold question that should be influenced by the Biop? I don't think so, because the overall question of how the water is going, what it's being used, it's being put for, and also how is the Central Valley Project being operated is really the crucial question. And that's where, again, the district court judge said that both Reclamation and Fish and Wildlife chose to examine the situation. Okay, but NRDC wants to be able to reach the base supply as well. And I think Judge Wenger said you don't have any discretion as to that, and essentially you would have to go back to court and win water rights over certain superior users. So the question is, I mean, is there, from your perspective, I mean, they want to consult on base supply, they want to consult on project water, all of those things. Is there a difference between what discretion you have on base supply and project water? Well, I think there clearly is. And let me emphasize something about base supply. If we walked away from these contracts, if the SRS contracts did not exist, it's not that Reclamation could lay its hand on that water. The SRS contractors claim superior rights. They have their own intakes. We cannot, it's not like a faucet we can turn off. They would start pulling in as much water as they thought they were entitled to. To cut them back, we would have to go into some sort of adjudicatory form, possibly the state water board, maybe a state court, I don't know. And we would have to litigate, and as has been pointed out, if you look at the Klamath water rights litigation, this could go on for 25 years before there's a resolution. So it's not like destroying the SRS contracts is going to do any good for the smelt. The earliest you could hope is 20, 25 years before we might have some water and we might have less water for the project water. Let me ask you a question. If we were to disagree with you concerning standing, and we were to disagree with you concerning the discretion on the contract renewals, given that the 2005 buy-off was found to be invalid and not appealed, do you agree that the Bureau violated the ESA in renewing the contract? Yes. I think, assuming the case is not looted. Yes, yes, yes is what I heard. I mean, my worry is this. Is this an issue that ought to be remanded to the district court in the first instance, or is this an issue that I can determine here? Because, yes, if you're giving in, then it seems to me that the third issue that, in fact, the petitioners have come to me with is done. If I determine standing, I determine discretion, and I go against you, and you admit then that basing these contracts on the 2005 buy-off is a violation of the ESA, then I'm done. Those are the only issues I have in front of me. Is that right? Is that right? No. There's a very good question, and this is where I am, too. Assuming those two things, what happens next, if that's what we get? Well, and assuming that there's no mootness issue. Well, I mean, the mootness is that I could say, well, then you want us to wait to see what Judge Rawlinson and her panel do? No, I don't even think you have to do that. I think that would be the next step. Let's not lose track of the question. So making those two assumptions, and I realize you don't want to concede anything. You're not conceding anything. I don't know where we're going to go on those two issues. But assuming that's when we get to conference, we get on those two issues, and they are, as Judge Smith has suggested, as his premise for the question. What next? What happens? Do the contracts become invalid? I mean, I think, as other Judge Smith, does Milo Smith use the term void up an issue? Is that the term? But is that quite right? Does that void the contracts? I don't quite know what happens at that point. Let's say the agency did something that turns out it should not have done. What is the effect then? If we lose on everything, I think you would remand to the district court to see what an appropriate remedy under these facts would be. I mean, the contracts stay in place. I mean, the contracts are contracts, right? They are contracts. But people have contract remedies. Other parties of the contract presumably would have contract remedies. They would, but I don't think the contracts should be automatically invalidated by this court. It's not an issue reached by the district court. I think there should be alternatives because, again, especially with reference to the SRS contracts, if those contracts are gone, we have chaos, and we lose all kinds of control over where the water goes. I thought a closing counsel said there would be consultation and then the future activities would be dictated by the results of the consultation. That's what they're requesting. Do you agree with that? That's one possibility, but we have yet another biological opinion, which is due in December of 2014. I'm not sure it will be issued then, but there is an ongoing biological opinion as a result of the cases before Your Honor. Counsel, the reason why a lot of us are focused on this is as indicated, if this arguendo NRDC is correct, they have standing, you have discretion on the contract, is it not correct that a conditioned precedent to the execution of the contract  Yes, but there was a consultation. This was not like the Houston case where the contract came first and then the consultation. I think you're into a gray area if you have consultation and it's subsequently determined that the underlying biological opinion That might be something for the district court to determine whether there was or there wasn't, but if there was no consultation as required by the ESA, then would you agree that the contract, I say void ab initio, because it means it's not valid because the conditioned precedent to its formation did not occur. Do you agree with that?  To be honest with you, Your Honor, I don't. I think it was certainly not treated that way in the Houston case. I think it would be up to the district court to make some factual findings. I'm conceding all of that. The district court is going to have to determine whether a consultation took place, but doesn't federal law require, if there's an agency action, you have discretion that before you can enter into the contract, you have to have a consultation. Well, my recollection is that in Houston where there was no dispute that there had been no consultation on some of the contracts, even there it was not automatic that the rescission would have to occur. And here where there's also no dispute that there was consultation, there's dispute as to whether it was adequate, it's just a different case. Let me ask you just a little bit differently. There was consultation, but is consultation now linked to a discarded buyout? Do you have any law that then suggests that that consultation retains any continuing vitality? No, because it's been replaced by another biological opinion. But that biological opinion took the contracts as a given because they had already been entered into in light of the earlier consultation and buyout, which was discarded and thrown out. So your predicate for the second 2008 buyout is an infirm base, is it not? No, because the 2008 buyout took that the contract existed as a given, but it didn't take it as a given that the water would be delivered under those contracts because especially with reference to DMC contracts, those contracts can and have been shorted repeatedly. Do you want to leave time? Yes, I'm cutting back. How many counselors are on here? There are two of us, Your Honor. One for the Sacramento River Settlement Contractors, one for the Delta Mendota Contractors. And which one are you? Sacramento River Settlement Contractors. My name is Stuart Somek. On behalf of the Sacramento River Settlement Contracts, I actually wanted to start with a statement that NRDC made at the opening of her comments, in that she said that the bottom line, or it all boils down to, whether or not you could have negotiated better terms in the contracts. And I don't think that that's the test at all. The test that is before this Court is whether or not there was any discretion that inured to the benefit of the species in the context of the contract negotiations. And, of course, the District Court found that there was no discretion. There was no discretion with respect to either project water or base supply. But I guess, is it your position that the contracts themselves require renewal? If so, how does the Article 2A, renewals may be made, how is that mandatory, not permissive? So I'm not, I think the federal, I think the Bureau had argued that it was sort of a patchwork that made the fact that they had to be renewed in the District Court as opposed to the contract itself. It is both the contract, Section 9, as well as state law that compels the renewal of the contract. You can't read one without the other. They interrelate to one another. The predicate for the grant of the United States water rights was to resolve or to settle the dispute with the senior water right holders on the Sacramento River. The choice in that context was either to adjudicate or to settle. Pursuant to Section 14 of the 1939 Reclamation Project Act, which gives the Secretary the discretion to settle these types of disputes, the Secretary entered into the settlement contracts. Settlement contracts themselves have then within them the fact that this is a complete settlement of the dispute over water. And when we talk about water... But let's say, let's just say for purposes of argument, let's say that I agree with you that the base supply is that they have no discretion to renew that, but that as to project water that there is some discretion. How does that play out in reality? Well, Article 9 doesn't distinguish between base and project water. It speaks in terms of both of those supplies. Can you then, in answering this, deal with Article 2, which says the contract shall remain in effect until and including March 2004, provided that under the terms and conditions mutually agreeable to the parties hereto, renewables may be made for up to 40 years? And then it goes on to say the terms and conditions of each renewal shall be agreed upon, not later than. Both of those taken together imply that there is a negotiation. If they're supposed to just simply go forward as a absolute identical renewal, those terms don't make any sense. Well, they don't in the absence of the existence of Article 9. Remember, Article 9 speaks in terms of the absolutes. Wait a minute. Wait a minute. During the term of... This is Article 9. It says during the term of this contract and any renewals thereof, it shall constitute the full agreement as between the parties. Well, that just says it's the full agreement. But that doesn't say that the agreement's terms and conditions can't be changed. Now, I don't see any distinction between base or project water in there. And Article 9 deals with base and project water, and it says it will be the full agreement among the parties. That's true. Counsel, that's an integration agreement. That basically says we don't have any side agreements. Whatever we enter into after 2004, that is the full agreement. But Article 2 says renewals can be mutually agreeable. So I'm having trouble with your argument. Well, Article 2, as the district court noted, deals with specifically pricing. In fact, the different contracts have slightly different wording with respect to Article 2. The ACID contract, which was the one that the court quoted in the district court decision, specifically refers to pricing. Keep in mind that the project water was being paid for, and as a consequence there was a need after the 40-year period compelled by state law, and that state law is the Section 90 of the 1939 Reclamation Project Act, the Central Valley Project Act, which compels the collection of restoration fees, and another law, 99-546, which compels, number one, the repayment of the Central Valley Project within 30 years, as well as the recovery of any O&M costs, including O&M deficits, that would have occurred or accrued over the 40 years of the contract. But, counsel, further to Judge Fischer's point, though, there have been changes, significant changes. I mean, price is a big change. Quantity is a big change. Both have changed. No, quantities have not changed. In 1928 contract, I mean, settlement contract, as I understand it, the quantity was changed. Is that correct? There were no changes in the quantity of water in the Sacramento River settlement contracts except for the two modifications of the ACID contract and the Sutter Mutual contract in 2005. There were no other modifications. That was a change, but according to your position, if I understand it correctly, that could change. It had to be a mutually agreeable. So if the parties didn't reach an agreement on the existing terms, they could have changed it, right? Through mutual assent. Right, but that involves discretion on the part of the agency, right, if it changes? It does not, not under the case law. The case law speaks in terms of mutual assent, the Platte River case, and, in fact, Homebuilders in its definition of discretion under Section 7 says that it must be discretion that could be exercised without the approval or the concurrence in another party. It reads out the whole notion of mutual assent. You can't go further to that if there isn't mutual assent, and that means you don't have a renewal contract. If you don't have, excuse me. The way this reads is that the contract is in effect until March 31, 2004, provided that under terms and conditions mutually agreeable to the parties here, too, renewals may be made. So the alternative to that is that if the parties can't mutually reach agreeable terms, then there won't be a renewal. Well, there has to be a renewal in order for the Central Valley Project to operate. The project can't operate without a settlement of the dispute with the settlement contracts. You might have to go back to court and fight and litigate it because this was a settlement in order to avoid ongoing litigation. Well, certainly, but, Your Honor, the contract itself provides that the only mechanism to vacate, in a sense, the settlement is, in fact, the general stream adjudication of the Sacramento River, which under the contract would have to be initiated by a third party, not by one of the two parties to the contract. But at the end of the contract, this provides for an end of this contract. So at the end of this contract, what happens if the parties don't mutually agree? Well, Article 9A provides that as to – I don't think Article 9 – if anybody who practices contract law or ever has knows that Article 9 is just a standard integration clause. It does not alter what Article 2 says. But Article 2 deals, again, with pricing. And the question is whether or not non-renewal is a discretionary action that would inure to the benefit of the species. And – And just to clarify then, the counsel for the government said that – and I took it from your answer on having – the discretion would have to be that absent agreement, the Bureau could take control of the river and the water sources. And you're suggesting that if there's no agreement, then your clients could act as senior upstream diverters and go ahead and take charge of the water source and divert at will, and then somebody else would have to come along and try and stop you. Is that your – is that what would happen? That's exactly right. We own the water rights. We own our diversion facilities. We own our conveyance facilities. We've done so since the 1800s. But the district court at that point could enter a preliminary injunction and hold everything in place until the parade of horrible 25 years of litigation landed its wake. In other words, is it realistic to think that absent mutual agreement that the – your clients could simply take over the water and there would be no remedy? It's not a taking over the water. It's merely an exercise of their water rights. Of their water rights that have never been finally adjudicated. Well, they don't need to be finally adjudicated. That's not how water rights work. Water rights work through the exercise of beneficial use. It's only when there is a dispute that an adjudication takes place. In this case, the contract itself avoided that dispute. Sure, if there was an adjudication, we would continue to exercise our water rights. And quite frankly, I think it's a pipe dream to think that the Sacramento-San Joaquin River could be adjudicated in 25 years. I think we're looking at much longer than that. And the kind of chaos that would exist in the Sacramento Valley and the state based upon the fact that these foundational water rights – and that's what you've heard all the way through. These water rights are foundational to the operation of the Central Valley Project would go out the window. And to the extent that what we're talking about here is Section 7A2 discretion that inures to the benefit of the species, what is being postulated is a situation where these contracts, in fact, don't exist and that what would happen is that that event would inure to the detriment of the species because the CDP simply couldn't operate. You have two minutes. Actually, I apologize. Two minutes. Chief Judge, could I ask that we allow some time for this last party because I would like to hear what they have to say since we've been asking questions of the other parties. Why don't we see how we're coming? Thank you. I'm Daniel Lohanlin. I represent the Delta-Medota Canal contractors. First, the court should not decide the merits of the validity of the consultation on renewal of the Delta-Medota contracts. The district court did not reach that issue. There is a defense that we can present as to why the invalidity of the 2005 biological opinion does not render the consultation on contract renewal invalid. The district court should be given the opportunity to address that. What is that defense? The argument is that under the consultation regulations, a completed biological opinion is accepted as part of the baseline for the consultation on another action. That's because there are lots of actions that agencies are undertaking that have undergone consultation that have effects on listed species. Those are considered part of the baseline. Our position is that the fact that the biological opinion was invalid does not render the consultation on contract renewal invalid. Therefore, your answer to my question would have been no. There was no violation of the ESA, even if they have standing, even if there should have been consultation. That's correct, Your Honor. Can you run that by me one more time? I'm sorry? Can you run that by me one more time? Yes. Now that I know what question you're answering. It's slightly different in this case, so I do want to know the answer to the question. So why would there not be a violation? Again, because the consultation regulations accept a completed biological opinion as part of the environmental baseline for another consultation. And it's very important to understand the way the agencies have divided the consultation regarding the CVP. All effects of CVP operations are addressed in the OCAP consultation, including all effects of delivering water under the Delta-Mendota-Fennel contracts. So the Delta smelt is considered only in the OCAP consultation. The contract consultation, the renewal consultation, did not address Delta smelt. It didn't consider Delta smelt at all. Is that the 2005? Yes. The 2005 in the so-called concurrence letters simply referred to the 2005 biological opinion and say impacts of Delta smelt were addressed there. We're not addressing them further here. They discussed kit fox. They discussed giant garter snake, terrestrial species in the service area. But by design, and this goes back to 2000, the agency set up this two-track approach to consultation. So they were going to deal with everything to do with smelt in the OCAP consultation. In the OCAP. 2005. OCAP is 2005. And there have been a series of OCAP. Sorry, yes. They deferred. OCAP, and we're talking about what consultation covered the smelt and the contracts? 2005? The 2005 biological opinion, which is the biological opinion regarding project operations. And OCAP is, I apologize, the shorthand we use for the consultation regarding project operations. There have been a series of biological opinions regarding project operations going back to 1993. And I suspect that going forward there's going to be a series of additional biological opinions addressing project operations. And the way the agencies have set this up is they look to that to address impacts of smelt. And the National Marine Fishery Service does the same with impacts of salmon. And that is where all those impacts are addressed. And then they take that as a given and then do consultation on other actions. For example, here, contract renewal. All right. But if this court were, and I'm saying this hypothetically, to determine that NRDC's claims are not moot and that they have standing, what happens next? Then it would go back to the district court for determination of the merits of their claim, that the consultation was unlawful. If the court found. Need to address the discretion issue that the district court said. Not for the DMC contracts. The DMC contracts allow the government to short the DMC contractors as much as is needed to comply with the ESA. In other words, there is discretion there. If it were back in the district court, you would simply raise your defense that the consultation was proper in the story. We would raise our defense. But that's a merits question. Or even that an improper consultation did not destroy the contracts. That's correct. That's correct. There would be a merits issue, which we would argue. And then if the plaintiff prevailed on the merits issue, then there would be the remedy issue. And I don't agree that the contracts are invalid as an issue. Let me ask you. You said that the contract takes care of it. As I understand it, that contract says nothing about whether the Bureau can do anything during wet years to protect the smell. Shortage provisions seem to be permissive. And under this rationale, the agency would never have to consult under Section 7 before entering into the contract. Don't those all undercut your argument that the contract just takes all of the discretion out of the issue? These contracts allow for reclamation to do whatever it needs to do to comply with the requirements. Except in those situations I just mentioned. Well, I'm not familiar with the situation. And it's permissive. I'm not familiar with the situation the court is referring to. Nothing in these contracts binds reclamation to do anything that would violate its obligations under the Endangered Species Act, whether it's a wet year, dry year, or any other type of year. They're completely defeasible in that sense, as the district court found. And to the court's question about ad venitio, if an agency fails to follow procedures required of it before it takes an action, that does not automatically mean that action is set aside. That is certainly one possible remedy allowed under the EPA and under the Endangered Species Act. But it's not necessary. And we cited in our brief some of the cases where this court has allowed, for example, oil and gas leases to remain in effect, notwithstanding the failure to follow procedures, including NEPA. The Conard v. Burford case is one example. So that, again, would be a question for the district court. Should it invalidate these contracts? Is that an appropriate remedy? And with respect to that, and we raised this in the district court, with respect to that, a number of these districts would raise, among other defenses, latches. Because they entered these contracts in 2005, and it wasn't until some years later that the plaintiffs brought this challenge to those contracts. In the meantime, they have taken actions dependent on the validity of these contracts. For example, public financing. Those are defenses that we would want to present to the district court to say, under the circumstances, it would be inequitable to impose this remedy of invalidating these contracts. So there are bond documents, things like that, that rely upon these? Yes, Your Honor. Now, those are not in the record. They're not in the record even in the district court, because the district court said we're not going to reach that issue. That will be a later phase. And so that is evidence that would be presented in proceedings in the district court. But back to the district court, though, right? I'm sorry? That would be in the district court. That would be in the district court, Your Honor. Yes. Okay. Thank you. Thank you. Our opponents have, I think, five minutes or so. Thank you, Your Honor. I'd like to address two quick points, and then turn to the mootness question. First, on the question of whether there were changes to the amounts of water delivered. In addition to the two reductions in base supply, the Bureau and the settlement contractors, in fact, did reduce project water. Those record sites are at page 64 of our reply brief notes. But I think the Bureau gave explanations for those two rejections. They didn't concede that they didn't concede they had discretion as to the base supply. That's correct? That's correct, Your Honor. I was answering the question as to project water. Numerous contracts had their project water reduced. And, in fact, Glen Caloosay Irrigation District had its project water increased under the contract. So there were certainly changes to those terms. Second, on the shortage provision question that the DMC contractors raised, I think it would be helpful to provide one particular example as to why that's not sufficient and why the contract, in fact, could have been negotiated in a more effective way. If you have a contract that promises you a 100,000-acre fee and says, but the Bureau can reduce that in the event that the ESA so requires, that is less protective than a contract that says you have a 50,000-acre fee, and it's a wet year. If there's more water, you can come back to us and ask for more. There's evidence in the record that shows the number of smelt that died during the interim when the ESA gets enforced. So in terms of supporting plaintiffs standing here, there's more than sufficient evidence. Turning to the question of mootness, I think it's important to remember that the test for mootness, one is the burden lies on the dependents, and second is whether there's any relief available that plaintiffs could seek. Here we have a 2008 biological opinion that one took the contracts as a given, but that most importantly, the Fish and Wildlife Service has said that the 2008 biological opinion itself is insufficient to protect the smelt. So certainly that suggests that there is more that could be done to protect the smelt, which is all that we need to show in terms of overcoming the argument on mootness. Further, the reasonable and prudent alternative that sets forth in the 2008 biological opinion has not been fully implemented. The Bureau has taken two of those components under submission, and one is this fall salinity standard, which deals with the amount of fresh water that's flowing out of the Sacramento River and how that affects the delta smelt's habitat. And right there, there is a tension between the Sacramento River contracts, settlement contracts, and how much they allow to flow downstream and the ability of the Bureau to actually implement the reasonable and prudent alternative. So for all those reasons, the mootness argument fails. Can you respond to one of the Council's remarks that if there isn't a mutual agreement reached, that then it reverts to the water rights that they have? Can you respond to that? Yes, Your Honor. And it does seem that a mutual agreement, you're not a party to that. If the mutual agreement is, you don't get to say anything about that. That's correct, Your Honor. That this is a negotiation, which I think one certainly points to the amount of discretion that the Bureau has. But it's a mutual agreement. They have to agree together. So why do you have any say there? You want to have some say in something that you're not. We don't want to have a say, Your Honor. We want the Bureau to comply with the ESA and to comply with the Section 782 consultation requirements. The regulations that govern the ESA specifically set forth contracts, entering into contracts as an example of agency action that's subject to the ESA. So the argument that somehow the fact that the settlement contractors also have to agree with the federal government when they enter into the contract does not remove the discretion that they have from the ESA. Well, the difference is the contract is a settlement contract. You have preexisting rights. It's one thing to enter into some new deal with somebody. It seems to me it's another if you've got settlement involving preexisting rights and you're trying to involve the chaos of further 30, 40, 50 years of litigation. Well, I think, Your Honor, as is set forth actually in the Decision 990 that everyone cites, that the potential of chaos is a powerful incentive for the Bureau and for the settlement contractors to enter into settlement contracts. But it's nothing more than that. The question is whether the Bureau has discretion to negotiate terms, and they did, and therefore they had to consult under the ESA. But if they don't agree, does that extinguish the rights of the contract? Under our reading of Article 9 and Article 2, yes, there would not be a contract. But then they lose all their water rights. No, they do not lose their water rights. I agree with opposing counsel that they would continue to have their senior water rights, which simply have not been adjudicated. Okay. Thank you. Thank you, Your Honor. These are solid. You will stand submitted. We'll adjourn.
judges: Kozinski, McKeown, Wardlaw, Fisher, Gould, Tallman, Rawlinson, Clifton, Callahan, M Smith, Nr Smith, Cjj